IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

SQUARE D COMPANY,                    §
                                     §
            Plaintiff,               §
                                     §
v.                                   §
                                     §   CIVIL ACTION NO. H-09-3917
HOUSE OF POWER ELECTRIC, L.C.,       §
A Texas Limited Liability           §
Company, and ALBERT CHLOUBER,        §
An Individual,                       §
                                     §
            Defendants.              §


## MEMORANDUM OPINION AND ORDER

     Plaintiff, Square D Company ("Square D"), brings this action
against the defendants, House of Power, L.C. ("HOP"), and Albert
Chlouber, for breach of contract.   Pending before the court are
Square D Company's Motion for Partial Summary Judgment (Docket
Entry No. 48), and House of Power Electric, L.C.'s Request for
Hearing (Docket Entry No. 52).   For the reasons explained below,
Square D's motion for partial summary judgment will be granted, and
HOP's request for hearing will be denied as moot.


## I.  Undisputed Facts

     Square D manufactures a variety of electrical products
including circuit breakers, panelboards, load centers, and
switches.  Square D distributes its electrical products through a
network of authorized distributors.  On a case-by-case basis
Square D provides rebates to its authorized distributors for sales

to certain approved customers.[1]   Authorized distributors are
expected to pass along rebated savings to approved customers.[2]
Square D's authorized distributors agree to not resell Square D
products to unauthorized distributors or resellers, and Square D's
approved customers agree to not resell Square D products but,
instead, to use the products themselves.[3]  Square D monitors the
purchases made by approved customers to ensure that they are only
purchasing products that are consistent with their business
practices and to ensure adherence to Square D's policy that
approved customers not resell Square D products.[4]

        HOP is a residential electrical contractor that provides
electrical service for new home construction.[5]  In 2002 or 2003 HOP
began receiving special rebate pricing for Square D products
purchased from Crawford Electric, and Square D started monitoring

---

[1]Square D Company's Motion for Partial Summary Judgment
("Square D's Motion"), Docket Entry No. 48, p. 3 (citing Exhibit C,
Oral Deposition of Tracy Garner at 83:23-84:7).

[2]Id. (citing Exhibit C, Oral Deposition of Tracy Garner
("Garner Deposition") at 90:24-91:8).

[3]Id. at 2-3 (citing Exhibit C, Garner Deposition at 6:5-10
("We have policies with . . . our authorized distributors, where
they're not allowed to purchase from or sell to another reseller;
and so my job is to monitor and make sure the distributors are
adhering to that policy. . .")).

[4]Id. at 3 (citing Exhibit C, Garner Deposition at 16:6-15).

[5]Oral Deposition of Albert Chlouber ("Chlouber Deposition"),
Exhibit E to Square D's Motion, Docket Entry No. 48, pp. 15:16-
16:15.  See also Defendant's Response to Square D Company's Motion
for Partial Summary Judgment ("Defendant's Response"), Docket Entry
No. 51, p. 1 ¶ 2.

HOP's rebate-eligible purchases.[6]  In 2005 HOP's president, Albert Chlouber, was asked to sign a document titled: "Square D/Schneider Electric Continuous Pricing Commitment Reselling Policy" ("Continuous Pricing Commitment"), which provides:

> This commitment offers your authorized Square D distributor continuous special pricing, based on competitive levels, for your use as an OEM, Contractor or Industrial customer.  Also included in this commitment is special negotiated pricing for project job business based on competitive situations.  This pricing is to be used for your application and/or fabrication of equipment, and does not authorize you to "re-sale" any Schneider Electric component to any other customer, distributor and/or reseller.  Failure to follow any of these guidelines can result in immediate termination of this commitment.  This commitment will be reviewed upon any change in distributor coverage and/or change of management or ownership of Subject Company.  This commitment may be rescinded or changed at Square D's sole discretion at any time without notice or cause.[7]

The document contains a space for "Company name," which has been filled in "House of Power Electric," beneath which the letters OEM have been circled.  Below the company name is a space for "Distributor name," which has been filled in "Crawford Electric." Below the distributor name is a space for "Customer Representative," which has been filled in "Albert Chlouber," next to which is a signature space signed by Albert Chlouber, and below

---

[6]Garner Deposition, Exhibit C to Square D's Motion, Docket Entry No. 48, p. 24:18-25.  See also Defendant's Response, Docket Entry No. 51, p. 2 ¶ 3.

[7]Exhibit D to Square D's Motion, Docket Entry No. 48.  See also Garner Deposition, Exhibit C to Square D's Motion, Docket Entry No. 48, at 77:4-78:5 and 110:4-6; and Defendant's Response, Docket Entry No. 51, pp. 2-3 ¶¶ 5-7.

which is a space for "Title" that has been filled in "President."
The document is dated "12-7-05."   Beneath the date in handwriting
is the following:   "* I must have these back to SQD by the 9th of
December, or the contracts will be cancelled.   Thanks, Gene."[8]
Square D continued  to provide Crawford Electric special pricing
for HOP's purchases.[9]

　　In early 2008 Square D asked Chlouber to explain purchases
that appeared to exceed the usual amount for a customer like HOP.[10]
On September 30, 2008, a caller identifying himself as a former HOP
employee contacted Square D to report that HOP was reselling
Square D products.   Later that day Square D terminated HOP's
ability to receive rebate pricing from Crawford Electric.[11]   In
October of 2008 Chlouber sent an e-mail to Square D stating "[i]t
is obvious that I made a mistake with resale of the product."[12]

---

[8]Continuous Pricing Commitment, Exhibit D to Square D's
Motion, Docket Entry No. 48.  See also Defendant's Response, Docket
Entry No. 51, pp. 2-3 ¶¶ 5-7; and Chlouber Deposition, Exhibit E to
Square D's Motion, Docket Entry No. 48, p. 98:14-19 (identifying
Gene Brenner as Crawford Electric's outside sales associate and
HOP's main contact).

[9]Garner Deposition, Exhibit C to Square D's Motion, Docket
Entry No. 48, at 106:4-21.  See also Defendant's Original Answer to
Plaintiff's Original Complaint, Docket Entry No. 6, p. 2 ¶ 13.

[10]Square D's Motion, Docket Entry No. 48, pp. 7-8 (citing
Exhibit F, February 11-13, 2008, e-mail exchange between Square D's
Leslie McFarland and HOP's Albert Chlouber).

[11]Id. at 8 (citing Exhibit C, Garner Deposition at 29:23-25 and
115:4-117:13).

[12]Id. (citing Exhibit I, Chlouber e-mail of Oct. 9, 2008).  See
also Chlouber Deposition, Exhibit E to Square D's Motion, Docket
　　　　　　　　　　　　　　　　　　　　　　　　　　　　(continued...)

## II.  **Standard of Review**

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment.  Fed. R. Civ. P. 56(c).  Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2511 (1986).  The Supreme Court has interpreted the plain language of Rule 56(c) to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986).  A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. Id. (citing Celotex, 106 S.Ct.

---

[12](...continued)
Entry No. 48, p. 57:1-9 (acknowledging that HOP resold Square D products via the Internet to Breakers Unlimited and individuals).

at 2553-2554).  In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 120 S.Ct. 2097, 2110 (2000). Factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." <u>Little</u>, 37 F.3d at 1075.

### III.  <u>Analysis</u>

Square D argues that partial summary judgment should be granted on liability for its breach of contract claim because HOP resold Square D products in breach of the Continuous Pricing Commitment signed by HOP's President, Albert Chlouber.[13]  HOP argues that Square D is not entitled to partial summary judgment on its breach of contract claim because the Continuous Pricing Commitment is not a valid contract, and because there are genuine issues of material fact for trial.[14]  Both parties cite Texas law in support of their arguments and therefore agree that Texas law applies to Square D's breach of contract claim.[15]

### A.    **Texas Law of Contract Formation and Construction**

In Texas, "the essential elements of a breach of contract claim are: (1) the existence of a valid contract;

---

[13]<u>Id.</u> at 9.

[14]Defendant's Response, Docket Entry No. 51, p. 4 ¶ 10.

[15]Square D's Motion, Docket Entry No. 48, p. 9; Defendant's Response, Docket Entry No. 51, pp. 5-6 ¶¶ 13-14 and p. 10 ¶ 20.

    (2) performance or tendered performance by the plaintiff;
    (3) breach of the contract by the defendant; and
    (4) damages sustained by the plaintiff as a result of the
    breach."

Mullins v. TestAmerica, Inc., 564 F.3d 386, 418 (5th Cir. 2009)

(citing Aguiar v. Segal, 167 S.W.3d 443, 450 (Tex. App. -- Houston

[14th Dist.] 2005, pet. denied)).   The elements of a valid and

binding contract are:   (1) an offer, (2) an acceptance, (3) a

meeting of the minds, (4) each party's consent to the terms, and

(5) execution and delivery of the contract with the intent that it

be mutual and binding.   Roman v. Roman, 193 S.W.3d 40, 50 (Tex.

App. -- Houston [1st Dist.] 2006, pet. denied), cert. denied, 128

S.Ct. 1662 (2008).   "Consideration is also a fundamental element of

every valid contract."   Id.   See also Texas Farm Bureau Cotton

Ass'n v. Stovall, 253 S.W. 1101, 1105 (Tex. 1923) (recognizing that

"a contract must be based on a valid consideration, and that a

contract in which there is no consideration moving from one party,

or no obligation upon him, lacks mutuality, is unilateral, and

unenforceable").   "Consideration is a bargained for exchange of

promises" and "consists of benefits and detriments to the

contracting parties." Federal Sign v. Texas Southern University,

951 S.W.2d 401, 408-09 (Tex. 1997), superseded on other grounds by

Tex. Govt. Code §§ 260.001-008.   "The detriments must induce the

parties to make the promises and the promises must induce the

parties to incur the detriments."   Id. at 409.   For example, in

Federal Sign the Texas Supreme Court found that a valid, binding

-7-

contract existed where the plaintiff promised to build scoreboards in exchange for the defendant's promise to pay for them.  The Court explained that the parties' promises "represented the respective benefits and detriments, or the bargained for exchange, necessary to satisfy the consideration requirement."  Id.

However, when illusory promises are all that support a purported bilateral contract there is no mutuality of obligation and, thus, there is no contract.  A promise is illusory when it fails to bind the promisor, who retains the option of discontinuing performance. See Light v. Centel Cellular Co. of Texas, 883 S.W.2d 642, 645 (Tex. 1994), partly overruled on other grounds by Alex Sheshunoff Management Services, L.P. v. Johnson, 209 S.W.3d 644 (Tex. 2006).

Under Texas law "[i]f the written instrument is so worded that it can be given a certain or definite meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law." Coker v. Coker, 650 S.W.2d 391, 394 (Tex. 1983).  "A contract, however, is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning." Id. (citing Skelly Oil Co. v. Archer, 356 S.W.2d 774, 778 (Tex. 1962)).  "Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." Id. Unambiguous contracts are enforced as written, and "in the ordinary case, the writing alone will be deemed to

-8-

express the intention of the parties." <u>Sun Oil Co. (Delaware) v. Madeley</u>, 626 S.W.2d 726, 728 (Tex. 1981).   A contract is not ambiguous merely because of a simple lack of clarity, or because the parties proffer conflicting interpretations of a term. <u>DeWitt County Electric Co-op, Inc. v. Parks</u>, 1 S.W.3d 96, 100 (Tex. 1999).   Parol evidence is not admissible for the purpose of creating an ambiguity.   <u>Universal C.I.T. Credit Corp. v. Daniel</u>, 243 S.W.2d 154, 157 (Tex. 1951).   However, when application of the pertinent rules of contract interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning, the contract is ambiguous.   <u>Id.</u> "Only where a contract is first determined to be ambiguous may the courts consider the parties' interpretation, and admit extraneous evidence to determine the true meaning of the instrument." <u>Kelley-Coppedge, Inc. v. Highlands Insurance Co.</u>, 980 S.W.2d 462, 464 (Tex. 1998) (quoting <u>National Union Fire Ins. Co. of Pittsburgh, PA v. CBI Industries, Inc.</u>, 907 S.W.2d 517, 520 (Tex. 1995) (citations omitted)).

**B.   Application of Texas Law to the Undisputed Facts**

In support of its argument that it is entitled to partial summary judgment on its breach of contract claim, Square D argues that the Continuous Pricing Commitment is a valid, enforceable contract.   Square D explains that (1) "it is undisputed that Square D and House of Power entered into a valid and binding

-9-

agreement,"[16] (2) "[u]nder the plain and unambiguous terms of the Agreement, House of Power promised not to resell Square D products,"[17] (3) "[n]o one disputes that Square D provided special pricing during the pendency of the Agreement,"[18] and (4) "House of Power does not dispute that it resold Square D products . . . during the term of the Contract."[19]

HOP argues that Square D is not entitled to partial summary judgment on its breach of contract claim because the Continuous Pricing Commitment is not a contract as a matter of law, and because there are genuine issues of material fact for trial on the remaining elements of Square D's breach of contract claim.  HOP also argues that if a contract exists, Square D waived its right to enforce the contract.[20]

1.   <u>Undisputed Facts Establish Existence of a Valid Contract</u>

Square D argues that the existence of a valid, enforceable contract is evidenced by (a) the unambiguous provisions in the Continuous Pricing Commitment, and (b) incontrovertible judicial admissions made in Defendant's Original Answer to Plaintiff's Original Complaint (Docket Entry No. 6).   In support of its

---

[16]Square D's Motion, Docket Entry No. 48, p. 9.

[17]<u>Id.</u> at 13.

[18]<u>Id.</u> at 16.

[19]<u>Id.</u> at 16-17.

[20]Defendant's Response, Docket Entry No. 51, pp. 4-9 ¶¶ 11-18.

argument that the existence of a valid, enforceable contract is
evidenced by the unambiguous provisions in the Continuous Pricing
Commitment, Square D argues that it

> promised to provide continuous special pricing to House
> of Power's authorized distributor in exchange for House
> of Power's promise not to resell Square D products.
> Square D's promise is expressly and unambiguously set
> forth in the following provision: "This commitment **offers**
> your authorized Square D distributor **continuous special
> pricing**, based on competitive levels, for your use as an
> OEM, Contractor or Industrial customer. **Also included in
> this commitment is special negotiated pricing** for project
> job business based on competitive situations."

> In return, House of Power promised not to resell
> Square D products. House of Power's promise is made
> explicit several times in the Agreement. For instance:

> - The Agreement provides that the special
>   pricing is for House of Power's use as a
>   contractor;

> - The Agreement elaborates that the pricing is
>   to be used for House of Power's application;
>   and

> - The Agreement expressly states that resales of
>   Square D products are not authorized.

> Thus, under the plain and unambiguous language of
> the Agreement, House of Power promises to use Square D
> products for its applications only and not resell the
> products to other customers, distributors or resellers.
> House of Power incurred the detriment of promising not to
> resell Square D products in order to enjoy the benefit of
> special pricing. And Square D incurred the detriment of
> allowing special pricing in order to enjoy the benefit of
> ensuring that its products would be purchased by House of
> Power as an end-user and would not be resold to
> unauthorized sources. *Fed. Sign*, 951 S.W.2d at 409.

> The parties therefore formed a valid and binding
> Agreement, as is reflected in the title of their
> contract, which is "Continuous Pricing Commitment." By
> using the word "commitment," the parties objectively
> manifested their intent to be bound. *See* BLACK'S LAW

DICTIONARY (9th ed. 2009) (defining "commitment" as "[a]n agreement to do something in the future").[21]

HOP argues that the Continuous Pricing Commitment is not a valid contract but, instead, (1) "is a UNILATERAL statement of Square D's intention to provide price breaks to a customer (House of Power) through Square D's distributor (Crawford Electric),"[22] (2) "is illusory because by its very wording it could end at the whim of Square D at any time, for any reason . . . or no reason, and without cause,"[23] and (3) "contains no mutuality of obligation."[24]  HOP explains that although Square D argues that the Continuous Pricing Commitment

> calls itself a "commitment," it could be "rescinded or changed at Square D's sole discretion at any time without notice or cause" (quoting the Square D Policy).  Simply put, there was no commitment and no contract whatsoever based upon the wording of the document.
>
> . . .
>
> The Square D Policy is illusory because by its very wording it could end at the whim of Square D at any time, for any reason . . . or no reason, and without cause. Because the document is subject to unilateral modification or rescission it is, necessarily, illusory. Because it is illusory there can be no contract. Plaintiff, by way of its Motion for Partial Summary Judgment, contends that the Square D Policy is a bargained for bilateral contract.  "When illusory promises are all that support a purported bilateral contract, there is no contract." *Light v. Centel*

---

[21]Square D's Motion, Docket Entry No. 48, pp. 10-12.

[22]Defendant's Response, Docket Entry No. 51, p. 4 ¶ 11.

[23]Id. at 5 ¶ 13.

[24]Id. ¶ 14.

> *Cellular Company of Texas*, 883 S.W.2d 642, 645 (Tex.
> 1994); *Vanegas v. American Energy Services*, 302 S.W.3d
> 299, 302 (Tex. 2009).  The "commitment" by Square D to
> provide "continuous special pricing" in the Square D
> Policy was illusory because it could be unilaterally
> withdrawn at any time for any reason without recourse.
>
> The Square D Policy contains no mutuality of
> obligation.  Square D could choose at any time, without
> reason, to cancel its "commitment" without ANY
> consequence to Square D.  Indeed, Square D was able to
> "opt out" of its "obligation" (commitment) unilaterally.
> As drafted, the only party capable of breaching would be
> House of Power.  If there is no mutuality of obligation
> there can be no contract.  In re: Palm Harbor Homes,
> Inc., 195 S.W.3d 672, 644; *Sterling Computer [Systems of
> Texas, Inc. v. Texas Pipe Bending Co.*, 507 S.W.2d 282
> (Tex. Civ. App. -- Houston [14th Dist.] 1974, writ
> ref'd)].[25]

In support of its argument that the Continuous Pricing Commitment
is not a valid contract HOP cites <u>Sterling Computer Systems of
Texas, Inc. v. Texas Pipe Bending Co.</u>, 507 S.W.2d 282 (Tex. Civ.
App. -- Houston [14th Dist.] 1974, writ ref'd); <u>Light v. Centel
Cellular Co. of Texas</u>, 883 S.W.2d 642 (Tex. 1994), <u>overruled on
other grounds by Alex Sheshunoff Management Services, L.P. v.
Johnson</u>, 209 S.W.3d 644 (Tex. 2006); <u>Vanegas v. American Energy
Services</u>, 302 S.W.3d 299 (Tex. 2009); and <u>In re Palm Harbor, Inc.</u>,
195 S.W.3d 672 (Tex. 2006).[26]

In <u>Sterling Computer</u>, 507 S.W.2d 282, a contract-for-services
case, the Texas Court of Appeals held that a contract failed for
want of mutuality as a matter of law because it contained an

---

[25]<u>Id.</u> at 4-6 ¶¶ 11, 13-14.

[26]<u>Id.</u>

express provision that not only limited the plaintiff's liability for failing to perform its contractual obligations to the defendant, but also contained no requirement that the plaintiff make a reasonable effort to perform the services for which the defendants had contracted.

In Light, 883 S.W.2d at 644, a covenant-not-to-compete case, the Texas Supreme Court held that consideration for a promise, by either the employee or the employer in an at-will employment, cannot be dependent on a period of continued employment. The Court reasoned that "[s]uch a promise would be illusory because it fails to bind the promisor, who always retains the option of discontinuing employment in lieu of performance." Id. at 645. The Court reasoned that "[w]hen illusory promises are all that support a purported bilateral contract, there is no contract." Id. However, the Court noted that "[i]f only one promise is illusory, a unilateral contract can still be formed; the non-illusory promise can serve as an offer, which the promisor who made the illusory promise can accept by performance." Id. at 645 n.6.

In Vanegas, 302 S.W.3d at 301-02, an employment case, the Texas Supreme Court cited the principle noted in Light, 883 S.W.2d at 645 n.6, in support of its holding that a company's offer to split proceeds from a sale or merger with original employees who remained at the company until such sale or merger was a non-illusory offer for a unilateral contract that was accepted by the original employees who remained employed at the time of the merger

-14-

because those employees had performed their originally illusory promise to stay employed until such merger occurred.  The Court reiterated that

> a unilateral contract may be formed when one of the parties makes only an illusory promise but the other party makes a non-illusory promise.  The non-illusory promise can serve as the offer for a unilateral contract, which the promisor who made the illusory promise can accept by performance.

Vanegas, 302 S.W.3d at 302 (citing Light, 883 S.W.2d at 645 n.6, and Sheshunoff v. Johnson, 209 S.W.3d 644 (Tex. 2006)).  The Court explained that

> [t]he issue turns on the distinction between bilateral and unilateral contracts.  "A bilateral contract is one in which there are mutual promises between two parties to the contract, each party being both a promisor and a promisee." *Hutchings v. Slemons*, 141 Tex. 448, 174 S.W.2d 487, 489 (1943) (quoting RESTATEMENT (FIRST) OF CONTRACTS § 12).  A unilateral contract, on the other hand, is "created by the promisor promising a benefit if the promisee performs.  The contract becomes enforceable when the promisee performs." *Plano Surgery Ctr. v. New You Weight Mgmt. Ctr.*, 265 S.W.3d 496, 503 (Tex.App.—Dallas 2008, no pet.); *see also Light*, 883 S.W.2d at 645 n. 6; 1 RICHARD A. LORD, WILLISTON ON CONTRACTS § 1.17 (4th ed. 2007) ("A unilateral contract occurs when there is only one promisor and the other party accepts, not by mutual promise, but by actual performance or forbearance.").  Both *Sheshunoff* and *Light* concerned *bilateral* contracts in which employers made promises in exchange for employees' promises not to compete with their companies after termination. *Sheshunoff*, 209 S.W.3d at 649 ("ASM promised to disclose confidential information and to provide specialized training under the Agreement, and Johnson promised not to disclose confidential information."); *Light*, 883 S.W.2d at 645 ("When illusory promises are all that support a purported *bilateral* contract, there is no contract.") (emphasis added). . . . Our discussion in footnote six of *Light* was confined to situations where a non-illusory promise could salvage an

-15-

      otherwise ineffective bilateral contract by transforming
      it into a unilateral contract, enforceable upon
      performance.

<u>Vanegas</u>, 302 S.W.3d at 302.

In <u>Palm Harbor</u>, 195 S.W.3d at 672, an agreement-to-arbitrate case, the Texas Supreme Court held that an agreement to arbitrate with the manufacturer of a manufactured home that provided the manufacturer a unilateral, unrestricted right to terminate was not illusory because the manufacturer was a third-party beneficiary to the contract between the seller and the purchasers who was not required to provide independent consideration for the arbitration agreement.   HOP merely cites <u>Palm Harbor</u> for the principle that "[i]f there is no mutuality of obligation there can be no contract."[27]

In this case the Continuous Pricing Commitment expressly provides that "[t]his commitment may be rescinded or changed at Square D's sole discretion at any time without notice or cause."[28] This language provided Square D an unlimited, unilateral right to change and/or rescind its commitment to provide special pricing to Crawford Electric for HOP's purchases of Square D products without recourse for HOP.   Since the Continuous Pricing Commitment did not bind Square D to provide special pricing to Crawford Electric for HOP purchases, Square D's promise to provide such pricing was

---

[27]<u>Id.</u> at 6 ¶ 14.

[28]Continuous Pricing Commitment, Exhibit D to Square D's Motion, Docket Entry No. 48.

-16-

illusory because Square D could never breach the commitment, and HOP could never enforce the commitment against Square D in the event that Square D decided to change or rescind HOP's special pricing. Therefore, relying on <u>Sterling Computer</u>, <u>Light</u>, <u>Vanegas</u>, and <u>Palm Harbor</u>, HOP argues that because Texas courts have held that an unlimited, unilateral right to rescind a bilateral contract renders the contract void for want of mutuality, i.e., consideration, the language in the Continuous Pricing Commitment that provides Square D an unlimited, unilateral right to change or rescind the commitment requires the court to find as a matter of law that the Continuous Pricing Commitment is not a valid contract.

HOP's argument is not persuasive, however, because as explained by the Texas Supreme Court in both <u>Light</u>, 883 S.W.2d at 645 n.6, and <u>Vanegas</u>, 302 S.W.3d at 302, "if only one promise [in a purportedly bilateral contract] is illusory, a unilateral contract can still be formed; the non-illusory promise can serve as an offer, which the promisor who made the illusory promise can accept by performance." <u>Id.</u> at 645 n.6. The undisputed facts of this case present just such a situation, i.e., a situation "where a non-illusory promise could salvage an otherwise ineffective bilateral contract by transforming it into a unilateral contract, enforceable upon performance." <u>Vanegas</u>, 302 S.W.2d at 302.

Here, the Continuous Pricing Commitment purports to create a bilateral contract pursuant to which Square D promised to provide special pricing for HOP's purchases in exchange for HOP's promise

-17-

not to resell Square D products.  However, Square D's promise was illusory because the Continuous Pricing Commitment reserved to Square D an unlimited, unilateral right to change or rescind HOP's special pricing at any time for any reason without recourse for HOP.  Although HOP contends that the Continuous Pricing Commitment did not unambiguously obligate HOP to not resell Square D products, for the reasons explained below in § III.B.2, the court disagrees. Consequently, HOP's non-illusory promise to not resell Square D products can be interpreted as an offer, which Square D -- the promisor who made the illusory promise -- accepted by performance, i.e., by providing Crawford Electric special pricing for HOP purchases of Square D products.  With Square D's performance as consideration, the provisions of the Continuous Pricing Commitment are valid and enforceable as to the Square D products for which HOP received special pricing.  In other words, HOP received considera- tion for its non-illusory promise to not resell Square D products when Square D provided special pricing for HOP's purchases of Square D products.  As the Texas Supreme Court explained in Hutchings, 174 S.W.2d at 489:

> "Though a contract be void for lack of mutuality at the time it is made, and while it remains wholly executory, yet, when there has been even a part performance by the party seeking to enforce the same, and in such part performance such party has rendered services or incurred expense contemplated by the parties at the time such contract was made, which confers even a remote benefit on the other party thereto, such benefit will constitute an equitable consideration, and render the entire contract valid and enforceable."

-18-

Accordingly, the court concludes that the undisputed facts of this case establish as a matter of law that a valid contract was formed pursuant to the Continuous Pricing Commitment when the non-illusory promise that HOP made not to resell Square D products became enforceable by Square D's performance of the illusory promise that Square D made to provide Crawford Electric special pricing for HOP purchases of Square D products.

### 2.   HOP Fails to Raise Genuine Issues of Material Fact

Square D argues that the undisputed facts establish that HOP breached the parties' valid contract because, pursuant to the Continuous Pricing Commitment, HOP unambiguously promised not to resell Square D products; Square D performed its obligations under the Continuous Pricing Commitment; and HOP breached its obligations under the Continuous Pricing Commitment by reselling Square D products.[29]   Asserting that the Continuous Pricing Commitment is ambiguous as a matter of law, HOP argues that many issues of disputed fact preclude granting Square D's motion for partial summary judgment.[30]

#### (a)   HOP Unambiguously Promised Not to Resell Square D Products for which HOP Received Special Pricing

HOP argues that the Continuous Pricing Commitment is ambiguous as a matter of law because it is subject to a myriad of

---

[29]Square D's Motion, Docket Entry No. 48, pp. 13-17.

[30]Defendant's Response, Docket Entry No. 51, pp. 6-8 ¶¶ 15-17, and p. 10 ¶ 20.

interpretations.[31]   HOP   explains   that   the   Continuous   Pricing
Commitment  could  reasonably  be  interpreted  (1)  "to be a unilateral
commitment   by   Square   D   to   provide   favorable   pricing   to   a
customer,"[32]   (2)   "to   admonish   its   customer   against   reselling
Square D products, but not REQUIRE the customer to not resell,"[33]
(3)  "to have as the sole consequence of reselling a cancellation of
special pricing,"[34] and (4) "to mean that House of Power could not
hold itself out as an authorized reseller of Square D Products."[35]
HOP does not cite any language in the Continuous Pricing Commitment
in support of these suggested interpretations, and the court finds
none.   Instead, the court concludes that by signing the Continuous
Pricing Commitment HOP's president, Albert Chlouber, unambiguously
acknowledged and agreed that the special pricing being offered to
HOP's authorized distributor (Crawford Electric) for HOP purchases
was for HOP's "use as an OEM, Contractor, or Industrial customer,"
and that "[t]his pricing [wa]s to be used for [HOP's] application
and/or fabrication of equipment, and [did] not authorize [HOP] to
're-sale' any [Square D] component to any other customer,

---

[31]<u>Id.</u> at 10 ¶ 20.  <u>See also</u> Defendant's Response to Square D
Company's  Reply  in  Support  of  Its  Motion  for  Partial  Summary
Judgment, Docket Entry No. 54, p. 5.

[32]Defendant's Response, Docket Entry No. 51, p. 10 ¶ 20.

[33]<u>Id.</u>

[34]<u>Id.</u>

[35]<u>Id.</u>

distributor and/or reseller."[36]  By signing the Continuous Pricing
Commitment, Chlouber unambiguously promised to use the Square D
products that it purchased pursuant to the special pricing commit-
ment for HOP's own work and not to resell Square D products to any
other customer, distributor, and/or reseller.  See Coker, 650
S.W.2d at 394 (under Texas law the interpretation of an unambiguous
contract is a question of law for the court to decide by "looking
at the contract as a whole in light of the circumstances present
when the contract was entered"); Sun Oil, 626 S.W.2d at 728
(unambiguous contracts are enforced as written); and DeWitt County,
1 S.W.3d at 100 (a contract is not ambiguous merely because the
parties to an agreement proffer conflicting interpretations).

Alternatively, even if the Continuous Pricing Commitment were
ambiguous as to the obligations imposed on HOP, HOP has failed to
cite any evidence from which a reasonable fact-finder could
conclude Chlouber's signature on the Commitment did not obligate
HOP not to resell Square D's products.  HOP argues that Chlouber
testified only that "sales were 'frowned upon', NOT that any sales
were in violation of any agreement that Square D erroneously claims
existed."[37]  Nevertheless, HOP fails to cite any specific testimony
in support of this contention, and the court concludes that the
following testimony of Chlouber refutes HOP's argument:

---

[36]Continuous Pricing Commitment, Exhibit D to Square D's
Motion, Docket Entry No. 48.

[37]Defendant's Response, Docket Entry No. 51, p. 7 ¶ 15(j).

Q.    Did you sign [the Continuous Pricing Commitment] on
      or around  12/7/05?

A.    Yes.

Q.    That's a fair assumption?

A.    Yes.

Q.    Okay.   And what was your understanding of  the
      document at the time, if you recall?

A.    Basically Square D gave this to Crawford and wanted
      me to sign it for some reselling issues.

Q.    What were the reselling issues?

A.    Well, Square D doesn't want you to resell.

Q.    Doesn't want you to resell their products once
      you've purchased them from Crawford?

A.    Correct.

Q.    Or from anybody else?

A.    Correct.

Q.    Was that your understanding at the time that you
      signed this?

A.    Yes.

Q.    And it continues to be your understanding today?

A.    Yes.

Q.    Okay.   And was it your understanding between the
      time you signed it and as you sit here today?

A.    Yes.

Q.    Okay.   You never deviated from that and thought
      Square D thinks it's okay for House of Power to
      resell its products?

A.    Correct.[38]

_____

[38]Square D's Motion, Docket Entry No. 48, pp. 5-6 (citing
Exhibit E, Chlouber Deposition at 37:23-38:25).

Based on these excerpts from Chlouber's deposition, the court concludes that no reasonable fact-finder could conclude that Chlouber's signature on the Continuous Pricing Commitment did not obligate HOP not to resell Square D's products.

> (b)   HOP Fails to Raise Fact Issues Regarding Square D's Performance and/or HOP's Breach

Square D argues that the undisputed facts establish (1) that Square D performed its contractual obligation to provide special pricing for HOP's purchases of Square D products,[39] and (2) that HOP breached its contractual obligation not to resell the Square D products purchased at special prices.[40]   Square D cites Garner's deposition as evidence that Square D provided special pricing for HOP's purchases of Square D products, and Chlouber's deposition testimony as evidence that HOP breached its contractual obligation not to resell the Square D products that HOP purchased at special prices by selling Square D products via the Internet.[41]   Garner testified that "[Square D] set up special pricing so that [Square D's authorized distributor] Crawford Electric could sell to House of Power."[42]   Chlouber testified as follows:

---

[39]Id. at 16.

[40]Id. at 16-17.

[41]Id.

[42]Garner Deposition, Exhibit C to Square D's Motion, Docket Entry No. 48, p. 106:15-17.

Q    Mr. Chlouber, I understand that House of Power did
     sell -- resell some Square D products between 2005
     and 2008.  Is that a correct understanding?

A    Yes.

Q    To whom did House of Power resell Square D products
     during that time period?

A    "We sold it to a company called Breakers Unlimited.
     And   some   miscellaneous   individuals   on   the
     Internet."[43]

HOP responds that "[m]any of the 'facts' set forth in
Plaintiff's Motion as undisputed are in fact disputed."[44]  In the
list of allegedly disputed facts contained in HOP's response to
Square D's motion HOP argues that there are genuine issues of
material fact for trial as to whether HOP received special pricing
for the Square D products that HOP purchased, and whether HOP
breached an agreement not to resell Square D products.  For
example, HOP asserts that

     (1)   "Garner [] testified that Crawford Electric was the
           one who determined the price to be charged for
           products it sells to House of Power;"[45]

     (2)   "Square D . . . claims that the rebates given to
           Crawford were to be passed along to House of Power.
           This is disputed . . .;"[46]

_____

[43]Chlouber Deposition, Exhibit E to Square D's Motion, Docket
Entry No. 48, p. 57:1-9.

[44]Defendant's Response, Docket Entry No. 51, p. 6 ¶ 15.

[45]Id. ¶ 15(a).

[46]Id. ¶ 15(d).

(3)  "Square D claims that the pricing is highly
     competitive and favorable.  This is disputed
     . . .;"[47] and

(4)  "Square D alleges that Mr. Chlouber made an
     admission in an email that 'he made unauthorized
     sales of Square D products.'  This quote is an
     allegation of Square D and NOT an admission by
     Mr. Chlouber.  The language misstates the contents
     of the email, which speaks for itself.  The issue
     raised by Square D creates a question of fact."[48]

The court is not persuaded that any of the evidence cited by

HOP constitutes evidence from which a reasonable fact-finder could

conclude that Square D failed to perform its contractual obligation

to provide special pricing for HOP's purchases of Square D products

from Crawford Electric, or that HOP did not breach its contractual

obligation not to resell the Square D products that it purchased at

special prices.  To the contrary, the Chlouber e-mail referenced in

HOP's motion shows that HOP purchased Square D products at special

prices and that HOP resold Square D products.  The October 9, 2008,

e-mail is from HOP's Chlouber to a Square D employee, and it states

in pertinent part:

> It is obvious that I made a mistake with resale of the
> product, but as you know we were a growing start up
> company and needed the cash flow. . . I now see that this
> was a huge mistake and I am very sorry it has caused a
> problem with Crawford Electric and Square D.
>
> My main concern as always is getting Crawford paid in
> full.  To do this I will need to complete hundreds of
> jobs with Square D product.  I would like to ask that
> Square D allow us to purchase the following items so that
> we can complete these current projects . . .

---

[47]Id. ¶ 15(e).

[48]Id. at 7 ¶ 15(k).

> In return, I agree to not sell any Square D merchandise,
> return all unused materials once projects are completed,
> and make sure all information about special contract
> pricing and resale is kept within management at House of
> Power.[49]

Moreover, in the "Summary of Facts" included in its response to Square D's motion, HOP acknowledges both that it received special pricing for purchases of Square D product and that it resold Square D products via the Internet.  HOP states that Square D

> put the House of Power account at Crawford Electric on a
> company rebate program.  The program allowed Crawford
> Electric to receive a rebate from Square D on each of the
> House of Power purchases from Crawford Electric of
> Square D products.  Crawford Electric would in turn pass
> along at least some of the savings to House of Power
> through reduced pricing. . .[50]

HOP also states that "[f]rom time to time Mr. Chlouber would sell some of House of Power's stock of Square D products to others."[51] These statements in HOP's response to Square D's motion are sufficient to establish that Square D did, in fact, perform it's contractual obligation to provide special pricing for HOP purchases from Crawford Electric, and that HOP did, in fact, breach its contractual obligation not to resell Square D products.

Based on this evidence, the court concludes that HOP is unable to cite any evidence from which a reasonable fact-finder could conclude that Square D failed to perform its contractual

---

[49]Exhibit I to Square D's Motion, October 9, 2008, e-mail from HOP's Albert Chlouber to Crawford Electric's Jason Vaughn, Docket Entry No. 48.

[50]Defendant's Response, Docket Entry No. 51, p. 1 ¶ 3.

[51]Id. at 3 ¶ 7.

-26-

obligations to provide special pricing for HOP's purchases, or that HOP fulfilled its contractual obligation not to resell Square D products purchased at special prices.   Accordingly, the court concludes that HOP has failed to raise a genuine issue of material fact for trial as to these issues.

3.   <u>HOP Fails to Raise Fact Issue as to Waiver</u>

HOP argues that the doctrine of waiver bars Square D's breach of contract claim because Square D knew that HOP was reselling Square D products as early as 2004 and no later than 2007 but, instead of enforcing HOP's promise not to resell Square D products, continued to provide Crawford Electric special pricing for HOP's purchases of Square D products.[52]   As evidence that Square D intentionally relinquished a known right to enforce HOP's promise not to resell Square D products, HOP cites the deposition testimony of Square D's Garner:

> Q.   And so I take it that since you closely monitor those and you've been monitoring them closely since 2004, well, you knew for a good, long time that House of Power was buying more circuit breakers than needed for the load centers they were purchasing, correct? . . .

> A.   We knew that House of Power was buying excess circuit breakers. We went to them and asked them what was going on, and they offered explanations that we relied upon.

> Q.   . . . And how long did you do that?

---

[52]<u>Id.</u> at 8 ¶ 18.   <u>See also</u> Defendant's Response to Square D Company's Reply in Support of Its Motion for Partial Summary Judgment, Docket Entry No. 54, pp. 3-4 ¶¶ 10-15.

A.   For four years.

Q.   And at any time before the end of 2008, did you
     ever know that they were doing something with those
     circuit breakers other than what they told you they
     were doing?

A.   Yes.

Q.   When did that happen?

A.   That happened in the Breakers Unlimited lawsuit.

Q.   And when would that have been?

A.   2007, sometime in 2007.

Q.   So, from 2007 onwards, you continued to sell at the
     special price, knowing that House of Power was
     using the circuit breakers in a manner that they
     were not telling you about, correct?

A.   On advice of our attorney, we --

Q.   No, don't tell me that.

A.   It's the truth.

Q.   Okay.

A.   Our attorney advised us.

Q.   Again, I don't necessarily think I want to hear
     that part.

     . . .

Q.   You can just answer the question, you either did or
     you didn't continue to -- and I'm not going to ask
     you why.

A.   Yes, we did continue, on the advice of our
     attorney.[53]

---

[53]Garner Deposition, Exhibit C to Square D's Motion, pp. 93:16-
95:4.

-28-

Waiver consists of full knowledge of a known right and intentional relinquishment of that known right. See United States Fidelity and Guaranty Co. v. Bimco Iron and Metal Corp., 464 S.W.2d 353, 357 (Tex. 1971) (citing Massachusetts Bonding & Ins. Co. v. Orkin Exterminating Co., 416 S.W.2d 396, 401 (Tex. 1967) ("Waiver has been frequently defined as an intentional relinquishment of a known right or intentional conduct inconsistent with claiming it.")). See also Addicks Services, Inc. v. GGP-Bridgeland, LP, 596 F.3d 286, 298 (5th Cir. 2010) (quoting Sun Exploration & Production Co. v. Benton, 728 S.W.2d 35, 37 (Tex. 1987)). The court is not persuaded that Garner's testimony constitutes evidence from which a reasonable fact-finder could conclude that Square D intentionally relinquished a known right to enforce HOP's promise not to resell Square D products. On the contrary, Garner testified that Square D began watching HOP's purchases in 2004 because Square D knew that HOP was purchasing an excess amount of breakers. Garner also testified that Square D went to HOP and asked HOP what was going on, and that HOP offered explanations for the excess purchases on which Square D relied. Garner testified that in 2007 when Square D learned through another lawsuit that HOP was selling Square D products to Breakers Unlimited, on advice of counsel Square D continued to provide special pricing for HOP purchases. HOP has not cited a case in which under analogous facts a court has determined that the conduct Garner described evidences an intent to relinquish a known right to enforce a contract. Moreover, e-mails

-29-

that Square D's Leslie McFarland exchanged with HOP's Chlouber in February of 2008 undisputedly establish that Square D never stopped asking HOP to explain what appeared to be excess product purchases, and that instead of admitting that HOP was reselling Square D products, Chlouber responded to Leslie McFarland's inquiry with business-related explanations.[54]  For these reasons the court is not persuaded that HOP has cited any evidence from which a reasonable fact-finder could conclude that Square D intentionally relinquished its right to enforce HOP's promise to not resell Square D products.  Accordingly, the court concludes that HOP has failed to raise a genuine issue of material fact for trial on its affirmative defense of waiver.

## C.   HOP's Request for a Hearing is Moot

Because the facts and legal arguments are adequately presented in the materials before the court, the court has concluded that oral argument would not aid the decisional process.  Accordingly, House of Power Electric, L.C.'s Request for Hearing (Docket Entry No. 52) will be denied as moot.

## IV.   Conclusions and Order

For the reasons explained above, Square D Company's Motion for Partial Summary Judgment (Docket Entry No. 48) is **GRANTED**.  Because

---

[54]See Exhibit F to Square D's Motion, Docket Entry No. 48, February 11-13, 2008, e-mail exchange between Square D's Leslie McFarland and HOP's Albert Chlouber.

the court has been able to resolve Square D's motion for partial summary judgment without a hearing, House of Power Electric, LC's Request for Hearing (Docket Entry No. 52) is **DENIED as MOOT**.

**SIGNED** at Houston, Texas, on this 7th day of December, 2011.

SIM LAKE
UNITED STATES DISTRICT JUDGE

-31-